Deseret Live Stock Company v. Commissioner.
Deseret Live Stock Co. v. Commissioner
Docket No. 33729.
United States Tax Court
1953 Tax Ct. Memo LEXIS 326; 12 T.C.M. (CCH) 310; T.C.M. (RIA) 53093; March 25, 1953
Walter G. Moyle, Esq., 1109 Warner Building, Washington, D.C., and Seymour Wells, C.P.A., for the petitioner. R. G. Harless, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioner's income tax liability as follows: Years
Deficiency
1946
$3,818.19
1947
2,833.18
1948
3,805.18
Respondent's motion for leave to amend his answer in order to allege an increased deficiency, made subsequent to the close of the hearing, was denied under Section 272 (e), Internal Revenue Code. Certain overpayments are claimed by petitioner. Both parties have conceded some issues. The remaining question is whether income from the sale of heifers during the years in controversy resulted in a capital gain within the *327 meaning of the 1951 amendments [1] to section 117 (j), Internal Revenue Code. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation organized under the laws of Utah, and maintains its principal office in Salt Lake City, Utah. It filed Federal income tax returns for the years in controversy on an accrual basis with the collector for the district of Utah. At all times in controversy petitioner was engaged in the business of raising and selling cattle, sheep, and wool. For many years petitioner has maintained herds of sheep and cattle, for the production of wool, for breeding purposes, and for sale. During the years in controversy petitioner's breeding herds numbered approximately 40,000 sheep and 5,000 cattle. Petitioner owned in fee large areas of grazing lands and obtained the use of approximately 500,000 acres of public grazing lands under the Taylor Grazing Act. Extensive ranch lands were maintained for the production of hay and grain. These lands were irrigated by water from reservoirs maintained by petitioner. Petitioner's sheep and cattle were *328 largely dependent for feed upon its grazing lands and the products of petitioner's ranches, which were dependent in turn upon rainfall. Water for petitioner's livestock and for maintenance of its reservoirs was similarly dependent. During or after impairment of grazing lands, ranch products and water, due to drought, or upon the occasion of such other natural events as accumulation of ice and snow which impeded feed distribution on the range, it became necessary for petitioner to reduce the number of animals in its various herds. During the period from May to November 1 of the years in controversy, and for many years prior thereto, petitioner maintained most of its livestock on its eastern properties or ranches located in Richmond, Summit, Morgan, and Weber Counties, Utah, an area of approximately 225,000 acres of fee land which was practically in one block. Both the sheep and the cattle grazed on the same territory in the summer and ate the natural grasses, forage, and "browses." In the winter the sheep were transported by rail to petitioner's lands in Tooele County, Utah, and grazed there on the natural grasses. The cattle remained on the eastern property and were fed on hay which *329 had been grown and stored during the previous summer. Petitioner worked continuously to improve its range capacity and productivity by the purchase of contiguous lands within and without its boundaries and by constructing reservoirs, reseeding its grazing lands, improving its fencing, and eliminating trespassers. Petitioner sold heifer yearlings (female cattle between 12 and 24 months of age) and two-year olds (between 24 and 36 months of age) during the years 1940 through 1948 as follows: Year
Number sold
1940
1
1941
0
1942
35
1943
1
1944
399
1945
0
1946
824
1947
471
1948
43
Approximate ages, in months, of heifers sold during the years in controversy, at the time of sale, were as follows: Date
Number
Age, Months
1/ 5/46
74
32
1/ 5/46
155
22
1/ 5/46
36
22
1/ 8/46
3
22
11/18/46
502
19
11/18/46
54
19
4/21/47
470
12
12/ 8/47
1
20
12/ 3/48
43
20
Petitioner did not purchase any cows, heifers or heifer calves during the taxable years or in prior years. All of the heifers in controversy were raised animals, were more than six months old when sold, and were held by petitioner for more than six months. *330 During the taxable years in controversy and for many years prior thereto, it was petitioner's established policy to hold female animals which were part of the breeding herd until they became unsuitable for breeding purposes because of age, disease, injury, sterility or any other disability, or because of an unexpected limitation on range capacity due to drought, storm, extreme cold or other catastrophe. The male cattle raised by petitioner were either sold as calves or retained as bulls for breeding purposes. Petitioner did not raise or maintain any heifers in the ordinary course of business except for breeding purposes, and regarded all female calves from time of birth as members of the breeding herd. The period of gestation for cattle is approximately nine months. It is quite possible for aheifer to become impregnated at the age of 12 months and to bear a calf at the age of 20 to 22 months. Petitioner turned its bulls into the breeding herd about the middle of June of each year and removed them in December. The sale of heifers in January of 1946 was motivated by unusually dry ranges due to the absence of rain and snow, and the prospect of a serious drought in the summer of *331 1946. The drought which in fact occurred in the summer of 1946 was the most severe since 1934 and had disastrous effects on petitioner. It lasted through the entire grazing season, caused grasses to dry up, leaves to fall off and browse, springs to dry up, reservoir levels to fall, and crops to wither. The number of heifers sold was governed by petitioner's estimate of feed requirements and available supply. The sale of heifers in November 1946 was motivated by the drought of that year. The sale of 470 heifers in April 1947 was made in order to relieve the burden on petitioner's drought-damaged range, prevent general detriment to the remainder of the herd, and facilitate the rehabilitation of the range. The 470 heifers sold in April 1947 were not born until the spring of 1946, when the drought had been anticipated and had begun. At no time during the years in controversy or prior thereto did petitioner have a normal surplus of female cattle. Petitioner was able at all times to provide for all able-bodied members of the breeding herds of cattle through its owned range lands, its grazing rights on public lands, and its reservoirs and ranch products, except in times of emergency and *332 catastrophe such as existed in 1946 and 1947, when a reduction in the herd became necessary. Petitioner never engaged in the business of feeding livestock for fattening and never acted as a broker either in buying or selling. The 36 heifers sold on January 5, 1946, the 43 sold on December 3, 1948, and the single heifer sold on December 8, 1947, were culls, or animals which had become undesirable for breeding due to sickness, sterility or some inferiority. The sale of these 80 animals resulted in a capital gain. The sale of the additional 1,258 heifers sold during the years in controversy was attributable solely to drought, range rehabilitation after drought, and the elimination of culls. In his determination of petitioner's net income respondent, for each of the years 1946, 1947, and 1948, allowed depreciation on certain bulls and bucks which were sold in those years. The depreciation so allowed was applied by respondent to reduce the basis of the animals sold. Petitioner had not deducted this depreciation on its tax returns and likewise had not applied it to reduce the basis of the animals sold. The effect of the respondent's adjustments should have been to reduce the ordinary *333 net income by the amount of the depreciation and to increase the long-term capital gain by the same amount. These adjustments should not have changed the net income at all since the reduction for additional depreciation was equal to the increase in the gain from the sale of the bulls and bucks. Respondent, however, reduced the net income by the additional depreciation without making a corresponding increase for the addition to capital gains and then deducted from the net income so reduced the increased capital gain to arrive at the ordinary income. The effect of this was to allow the depreciation twice and to understate the ordinary net income by the amount of the depreciation which was $1,890.16, as follows: For the year 1946
$968.34
For the year 1947
557.20
For the year 1948
364.62
Total
$1,890.16
Respondent's allowance of excessive depreciation to petitioner resulted in an understatement of its ordinary net income for the years in controversy. Opinion Respondent characterizes the present issue as "a factual determination." See Regulations 111, sec. 29.117-7 (c). Under the present circumstances that may well be so. The amendment to section 117 (j) accomplished *334 by the Revenue Act of 1951 may, as respondent insists, have been no more than declaratory of existing law. Even on that assumption, the distinction from such cases as Walter S. Fox, 16 T.C. 854, affirmed (C.A. 4), 198 Fed. (2d) 719, and Laflin, et al. v. United States (D.C. Neb.), 100 Fed. Supp. 353, is manifest. In the Fox case petitioner was in the business of selling registered livestock for breeding purposes and "registration was of equal importance in insuring a market for such stock as breeders. * * * Petitioners' custom of selling the heifers with calf, and the bulls with the guarantee that they were breeders, necessitated that they be bred once." And as to Laflin v. United States, supra, respondent describes "the basis or theory of the Court's decision * * * [as] that these animals had not become members of the breeding herd and were regularly raised for sale; that they constituted the yearly 'money crop.'" The present situation is diametrically opposite. Petitioner's regular course of business was to retain all heifers for the breeding herd but to sell a large proportion of the young bulls. None of the latter are in controversy. *335 Cf. James M. McDonald, 17 T.C. 210. Our findings show that there were a number of years in which no heifers whatever were sold; that in several other years only those were sold which were "culled" from the breeding herd and no longer suitable for that purpose, Albright v. United States (C.A. 8), 173 Fed. (2d) 339; and that only when extraordinary and unusual conditions of drought made it necessary temporarily to diminish the size of the herd were those heifers sold which give rise to the present controversy. See Pfister v. United States (D.C.S.D.), 102 Fed. (2d) 640, where sale was occasioned by difficulties in obtaining ranch help. The most nearly plausible argument is respondent's suggestion that since the drought was foreseen about or before the beginning of 1946, some part of the sales made in that year were taxable as ordinary income because petitioner must have recognized that it would be necessary for it to reduce its herd and thereby require that some part of its livestock be held for sale. But cf. O'Neill, et al., v. United States (D.C., S.D.Cal.), * * * Assuming that this might be a reasonable inference where petitioner has the entire *336 burden of proof, respondent by conceding in his deficiency notice that 598 out of 824 heifers sold in 1946 were held for use in petitioner's trade or business has undertaken the burden of proving the relevant facts to that extent which on this record seems to us to include proof of the necessary intent on the part of petitioner. This burden has certainly not been borne. Treating the issue as one of fact, we find it impossible to conclude under these circumstances that any of the heifers in question were "held" by petitioner "primarily" for - that is with the purpose of - "sale to customers in the ordinary course of its * * * business." That conclusion, of course, becomes strengthened if the 1951 amendment [2] is construed to mean that animals of any age become property used in the trade or business upon acquisition if accompanied by an intent to introduce them into the breeding herd. That, however, is a question we need not now consider. Our finding that the livestock in issue were not held primarily for sale in the ordinary course of petitioner's business disposes of the proceeding. See Isaac Emerson, 12 T.C. 875, 878-879. *337 In view of a depreciation issue, all of the facts as to which have been stipulated, and of other concessions by petitioner, a recomputation will be necessary. Decision will be entered under Rule 50. Footnotes
1. Revenue Act of 1951, section 324.↩
2. "Such term [property used in the trade or business] also includes livestock, regardless of age, held by the taxpayer for draft, breeding, or dairy purposes * * *." Revenue Act of 1951, section 324. (Italics added).↩